ERIOUS JOHNSON, JR. OSB #130574
E-mail: *ejohnson.HJLLC@gmail.com*
HARMON JOHNSON LLC
University Station Executive Suites
698 12th St. SE, Ste 240, No. 4
Salem, OR 97301
Phone: (503) 991-8545
Fax:    (503) 622-8545

Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| TIM L. McCLOUD, | Civil Case No. 21CV00650 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CITY OF SALEM PUBLIC WORKS, | (Civil Rights/Employment – 42 USC § 2000e-2(a)(1), 42 USC § 2000e-3(a)) |
| Defendants | |
| | **DEMAND FOR A JURY TRIAL** |

## I.  INTRODUCTION

1.  Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), 42 USC § 2000e-2(k), and 42 USC § 2000e-3(a), Plaintiff alleges employment discrimination based on his race, as well as retaliation for opposing this unlawful employment practice. Plaintiff seeks damages and equitable remedies, including attorney fees and litigation expenses/costs, including expert witness fees and expenses in an amount to be determined by a jury at trial.

PAGE 1 – COMPLAINT



## II. JURISDICTION AND VENUE

2. This court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because plaintiff asserts a cause of action arising under the Constitution, laws, or treaties of the United States.

3. Venue is in the Eugene Division of the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

4. On or about November 18, 2019, Plaintiff filed an administrative complaint with the Bureau of Labor and Industries ("BOLI"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC") alleging race-based discrimination and retaliation as alleged herein. On or about February 17, 2021, EEOC issued a right to sue to Plaintiff, as such, this action has been commenced within 90 days after Plaintiff received that notice.

## III. PARTIES

5. At all material times, Tim L. McCloud ("Plaintiff") was an individual employed by Defendant City of Salem Public Works.

6. Defendant City of Salem Public Works Department (Public Works) plans, constructs, and maintains the City's infrastructure. Defendant Public Work's main office is located at 555 Liberty ST SE, RM 325, Salem OR 97301. Defendant Public Works is an "employer," pursuant to ORS 659A.001(4)(a) and 42 U.S.C. § 2000e(b), and "person," pursuant to ORS 659A.001(9) and 42 U.S.C. § 2000e(a).

## IV. FACTS

7. Plaintiff is a tall, imposing, yet soft-spoken individual, who identifies as a Black male, or African American for the politically correct.



8.     On or about, November 1, 2018, Defendant hired Plaintiff as a Program Coordinator for its Development Services Division.

9.     The only job duties and expectations Defendant provided to Plaintiff was a list of *Employee Expectations*, which stated:

> Be attentive to customer service. Above all else, your job is to serve the residents and businesses of Salem and the surrounding communities. Address people politely and always be ready to help them to the best of your professional abilities.
>
> Be honest. Your job is a position of trust. The work you perform and the interactions you have with others- residents and coworkers- must be performed in an honest and straightforward manner.
>
> Be professional. All of the work you perform requires a high degree of training. With this training comes a commitment to professionalism to your job and your employer. Many jobs require state-issued licenses and certifications. It is your responsibility to meet all requirements to keep them current.
>
> Be safe. Many of our jobs are inherently dangerous, yet nothing we do is worth your life. A safe working environment starts with dressing appropriately for your job, using proper personal protective gear, properly setting up job sites and looking out for your coworkers. Safety is your responsibility.
>
> If in doubt speak with your supervisor. Every supervisor is a resource. If you find yourself in a situation in which you are uncertain what you should do, contact your supervisor. If you must take immediate action, use your best judgment and then contact your supervisor at the first possible opportunity.
>
> Come to work sober. The City of Salem is a drug-free employer. Never come to work if you are under the influence of alcohol or drugs. Do not come to work if you are taking medication that may limit your ability to undertake your work tasks safely.

10.    On or about November 14, 2018, during an interdepartmental meeting, Glenn Davis, Defendant's Chief Development Engineer, told Don Whitehurst, a Defendant Construction Engineer, and James Lofton, a Defendant Program Manager that, "[Plaintiff] is the nicest person I've ever met."

PAGE 3 – COMPLAINT



11.     On or about November 20, 2018, during a one-on-one meeting, Glenn Davis told Plaintiff, "I guess I haven't completely ruined my reputation by hiring you."

12.     On or about December 5, 2018, during a morning meeting, in front of staff and Plaintiff's co-workers, Glenn Davis referred to Plaintiff as "Homie da Clown."

[1]

13.     On or about December 14, 2018, during a one-on-one meeting, Glenn Davis told Plaintiff that he was going to treat Plaintiff as an "experiment" as a general program coordinator, rather than develop Plaintiff in a specific area of assignment as Defendant had done with Plaintiff's white counterparts.

14.     On or about December 18, 2018, while Glenn Davis was standing next Plaintiff's desk—which did not have walls as other cubicles did and set apart from Plaintiff's white counterparts—he told Plaintiff that that location was chosen as a part of the aforementioned "experiment."

15.     On or about January 8, 2019, during a meeting that included Plaintiff and James Suing, a Defendant Program Coordinator, James Suing, made the comment, "And then you're toast. Burnt toast." This shocked Plaintiff, prompting Plaintiff to ask James Sung for

---

[1] *Homie Da Clown*, available at https://www.writeups.org/wp-content/uploads/Homey-D-Clown-In-Living-Colors-Damon-Wayans-a.jpg (last visited Mar. 27, 2021).



clarification, specifically, "Was that a racial joke?" Rather than clarify the intention of this comment, James Suing ignored Plaintiff and left the meeting.

16. During early January 2019, James Suing told Plaintiff that a co-worker in another department commented on how James Suing was one of the two nicest dressed staff working at the City of Salem, and the other referred to Plaintiff as "Well you know.. the Black guy."

17. On or about January 15, 2019, James Suing described the way Plaintiff once opened the door for work in the morning as "aggressive" to a co-worker. Plaintiff heard James Suing make that statement and approached James Suing to ask him to stop making jokes about Plaintiff being aggressive.

18. On or about January 18, 2019, James Suing again made several jokes about how "aggressive [Plaintiff] is." James Suing referred to Plaintiff as aggressive when speaking to Jennifer Scott, a Defendant Program Coordinator, in front of Plaintiff. Shelby Bigby, a Defendant Permit Technician, and James Suing made also made jokes about how "aggressive" Plaintiff was in Plaintiff's presence.

19. On or about January 24, 2019, Plaintiff was reassigned to Commercial Projects in addition to Land Use Projects. James Suing was assigned as my trainer for Commercial Projects.

20. On or about January 29, 2019, Shelby Bigby appeared at Plaintiff's desk and demanded to know, "Why don't you like me?" Shelby Bigby made this statement in the presence of James Suing. Plaintiff responded that he did like Shelby Bigsby, to which she responded "Good, because you will last a lot longer here if you do."

21. On or about January 30, 2019, Glenn Davis explained to me that due to the complexity of the regulatory environment, Jennifer Scott, a white program supervisor, was "still



new," and was not yet expected to know everything about her role although she has recently completed her second year in the department.

22. On or about February 8, 2019. James Suing made a joke and told Plaintiff that "You aren't cultured enough to understand."

23. During early February 2019, Glenn Davis began scheduling weekly one-on-one meetings with Plaintiff. None of Plaintiff's white counterparts were ever scheduled for weekly one-on-one meetings with Glenn Davis. Plaintiff asked about moving to an empty cubicle within the department, rather than sit at the open "experimental" desk. Glenn Davis said yes, and that he would find out what steps needed to be taken. Plaintiff told Glenn Davis that Plaintiff did not prefer to sit in the "experimental" cubicle. Plaintiff told Glenn Davis that because of where Plaintiff was sitting, people were approaching him and taking up Plaintiff time about matters that were not work related.

24. On or around February 20, 2019, James Suing looked at a photograph of my biracial family, and in front of Robin Dalke, a Defendant Administrative Analyst, told her that Plaintiff's family was not real.

25. On or around February 22, 2109, James Suing began punching and slapping the wall to Plaintiff's cubicle or desk when he walked by.

26. On or about March 4, 2019, Plaintiff was walking to lunch with James Suing and Zach Diehl, a Defendant Program Coordinator. Zach Diehl told Plaintiff that "those look like murdering gloves." Plaintiff asked Zach Diehl, "is that an OJ Simpson joke?" Zach Diehl responded, "I am not going to answer that." Plaintiff again asked, "Is that an OJ Simpson joke." Zach Diehl again said, "I'm not going to answer that."



27. On or about March 5, 2019, Shelby Bigby said, "Why do you look so suspicious?" Plaintiff asked Shelby Bigby, "Did you ask me that because I am Black?" Shelby Bigby responded, "Yes," and laughed at Plaintiff.

28. On or about March 5, 2019, in response to several news articles reporting in the City of Salem's treatment of those who report harassment and discrimination[2], City Manager released the *City Manager's Update*, which stated in part,

> "You may have read an article in the Statesman Journal about our organization. I want to assure you that you have a right to work in a safe environment free from harassment and discrimination. The City of Salem, and I, do not tolerate harassment, discrimination, or retaliation.
>
> The City's Respectful Workplace Policy can be found on the @Works or via this link: APP #4.4 Non-Discrimination, Harassment, Retaliation Policy, and the Human Resources Rules.
>
> If you have concerns or have experienced harassment, discrimination, or retaliation, please notify your supervisor or the Human Resources Department. Complaints are taken seriously and reviewed promptly once they are reported.[3]

29. During early March 2019, as Plaintiff attempted to move into an open cubicle amidst his white counterparts, Shelby Bigby told Plaintiff that, "We've decided to hold off on moving you."

30. During early March 2019, at weekly on-on-one meetings, Glenn Davis began claiming that Plaintiff was "not being productive enough." Plaintiff was made to feel like he needed to work twice as hard as his white counterparts in order to be considered "productive."

---

[2] Jonathan Bach, *'Blatant Discrimination,' sexual harassment cited as City of Salem workplace problem*, Statesman Journal (Feb. 26, 2019), available at https://www.statesmanjournal.com/story/news/2019/02/26/workplace-discrimination-sexual-harassment-alleged-city-salem-employees/2906903002/ (last visited Mar. 28, 2021).

[3] City Manager's Update – March 5, 2019, available at https://www.cityofsalem.net/CityDocuments/city-managers-update-2019-03-05.pdf#search=harassment (last visited Mar. 28, 2021).



PAGE 7 – COMPLAINT

31. During early-to-mid March 2019, in response to asking Robin Dalke about a single-family program procedure, I was told by Ms. Dalke to receive Single Family training from Jason Long, as she did not know much about the Single Family program.

32. During mid-to-late March 2019, Shelby Bigby was promoted to Program Coordinator and took the empty cubicle that was previously assigned to Plaintiff, who was hired as a Program Coordinator prior to Shelby Bigby's promotion.

33. During Late March 2019, during a one-on-one meeting, Glenn Davis said, "You need to be more like the white guy in the movie Hitch."


[4]

34. During early April 2019, at one-on-one meetings with Glenn Davis began to accuse Plaintiff of a "lack of progress."

35. On or about mid-April 2019, during a cross department team meeting Robin Dalke introduced Shelby Bigby to the group by saying "Shelby's our new Program Coordinator, so be nice." Shelby had previously spent six months in the department as a Permit Technician. This advisory to the group had never been offered for Plaintiff as a new employee in the same position.

---

[4] Presumably, Glenn Davis was referring to was Kevin James, available at, https://1.bp.blogspot.com/_3tHxQJ64k2k/TMB58hrUfJI/AAAAAAAACu4/FUG_Ilg92_g/s1600/Hitch-5.jpg (last visited Mar. 27, 2021).



36. On or about mid-April 2019, during a training in which Jason Long and Plaintiff had made the same mistake, Robin Dalke pointed her finger at Plaintiff in addressing that mistake. Robin Dalke did not point her finger, however, at Jason Long, even though he made the same mistake four times, and Plaintiff has made the mistake just once.

37. On or about April 17, 2019, Todd Merklin, a Defendant Human Resources Analyst, called Plaintiff down to HR regarding Shelby Bigby's comment.

38. On or about April 18, 2019, Todd Merklin came to the department and spoke with Glenn Davis. Later that afternoon, James Suing and Shelby Bigby made statements mocking Plaintiff and repeated the phrase "strong language", such as "That's strong language," or "That sounds like strong language to me." By this point, Plaintiff was aware that his concerns about the racist and discriminatory treatment had been subjected to by Defendant's agents and employees had been shared throughout the department. Thereafter, when Plaintiff asked work related questions, he received short or incomplete answers, and was still being treated in a discriminatory manner.

39. Between April 19 to approximately May 2, 2109, Plaintiff was on vacation leave, which was negotiated with Peter Fernandez, Defendant's Director, prior to accepting the position.

40. During early May 2019, during staff meeting, Glenn Davis states that if an individual says, "no offense" prior to a statement, that they can get away with saying anything they want about someone else.

41. On May 9, 2019, in a cross-department meeting attended by Salem City Attorney Tom Cupani, Don Whitehurst, James Lofton, James Suing, Curt Pellatz, a Defendant Prgram Coordinator, Jennifer Scott, Shelby Bigby, Glenn Davis, and Plaintiff, Glenn Davis said "I try to



keep it as Gringo[5] as possible." James Suing looked at Plaintiff and made eye contact as soon as it was said. One of the Salem City attorney present, Tom Cupani, was in the room sitting directly behind Plaintiff when Glenn Davis made that statement and did nothing to correct Glenn Davis. Additionally, half the white people in the room laughed, on information and belief, the other half did nothing.

42.     On or about May 10, 2019, during a one-on-one meeting, Glenn Davis told Plaintiff that the "Honeymoon was over" regarding his training period, although Plaintiff was told prior to hire that learning the role would take up to a year to learn.

43.     Glenn Davis accused Plaintiff of making the same mistakes over and over. Glenn Davis pulled out a spreadsheet of mistakes. The most recent mistake was at least a month old. Plaintiff told Glenn Davis that Plaintiff was not getting the training Plaintiff needed and felt that excluded and treated differently by coworkers in regard to work events, such as meetings and information.

44.     Plaintiff also told Glenn Davis about ways that Plaintiff was learning to coordinate the Single-Family program, as well as taking initiative to create procedures of his own. Plaintiff told Glenn Davis that several customers had recognized inappropriate conduct by Shelby Bigby and made comments about her behavior towards Jason Long.

45.     On or about May 17, 2019, after meeting with Robin Dalke and Glen Davis, in which Plaintiff was mocked, Plaintiff was written up for "improper conduct," [Human Resources 8.03] (which included indolence, incompetence). Plaintiff was then assigned to a be supervised by a subordinate, Robin Dalke.

---

[5] The word *gringo* originally referred to any kind of foreigner, available at https://en.wikipedia.org/wiki/Gringo (last visited Mar. 27, 2021).



PAGE 10 – COMPLAINT

46.     On or about May 20, 2019, Plaintiff informed Robin Dalke that he was being mischaracterized because of his race and for contacting Human Resources. Robin Dalke immediately followed up with Plaintiff in person and told Plaintiff that she was "sorry that [Plaintiff] had had to experience the pain" of what was said, and that she was "a new manager" unsure of how to proceed.

47.     Robin Dalke informed Plaintiff that the email response had been forwarded to Peter Fernandez and others. She stated that she had been unaware of how significant the training issues were, and that she "couldn't imagine what I was going through," and that "My heart breaks for you." Robin Dalke told Plaintiff that she was going to work with me to resolve gaps in training.

48.     On or about May 21, 2019, Plaintiff attended a meeting with Peter Fernandez and Todd Merklin where Plaintiff informed them about being treated differently, being "written up" because of his race, and enduring racist and discriminatory language.

49.     On or about June 7, 2018, Plaintiff had a discussion with Jason Long about training, training manuals, and the discovery that a packet that was initially handed to me as a training document for Single Family program review was marked with incorrect information, and that, replicating the packet several times had been used against me.

50.     On or about June 10, 2019, Glenn Davis returned from a three-week leave. During a staff meeting, Glenn Davis stated that a site developer deserved a "severe whipping" regarding delays in needed plans. Plaintiff received this as a roundabout threat, given the use of the anlogy "whipping." Robin Dalke forwarded a revised spreadsheet showing that training improvements have been made, and that most recent project had no concerns.

51.     On or about June 11, 2019, Plaintiff found an email had been sent to him after

PAGE 11 – COMPLAINT



work hours on June 10, 2019, inviting him to a Human Resources meeting with Robin Dalke, Glenn Davis, and Todd Merklin. Plaintiff requested that the meeting be rescheduled so that he have a union representative present. However, there was no indication that Plaintiff was to receive any disciplinary action.

52. The meeting was rescheduled for 20 minutes later and included Glenn Davis, Todd Merklin, and union rep Kathy Knock.

53. Plaintiff was discharged at that meeting.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 2000e-2(a)(1)**
**Intentional Employment Discrimination**
**Based on Race**

54. Plaintiff incorporates paragraphs 1 through 53 as if fully set forth herein.

55. "It shall be an unlawful employment practice for an employer to … discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race, [and] sex … or to limit, segregate, or classify [their] employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [their] status as an employee, because of such individual's race [and] sex … ."

56. From the inception of Plaintiff's employment, Defendant's agents and employees subjected him to a course of racist vitriol.

57. Plaintiff was separated and isolated from the rest of his white counterparts, as a means of hampering, impeding, and forestalling his training and advancement.

58. Plaintiff was denied training opportunities available to his white counterparts, as a means of hampering, impeding, and forestalling his development and advancement.



59. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered economic damages in the form of lost wages and benefits in an amount to be determined by a jury at trial.

60. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered non-economic damages in the form of outrage, betrayal, offense, indignity, embarrassment, humiliation, injury and insult in amounts to be determined by the jury at trial.

61. Defendant's conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to Plaintiff's federally protected rights, which warrants an imposition of punitive damages in such amounts as the jury may deem appropriate to deter future violations.

62. Plaintiff seeks recovery of all other equitable relief and damages as provided by law, in addition to reimbursement of her reasonable attorneys' fees and costs pursuant to 42 USC § 1988 and 28 USC §1927, if appropriate.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 2000e-3(a)
## Retaliation

63. Plaintiff incorporates by reference the allegations of paragraphs 1 through 62 above.

64. "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter … ."

65. Plaintiff voiced his issue with the language being used to characterize and dehumanize him on several occasions to Defendant directors, supervisors, managers and human resource personnel.

PAGE 13 – COMPLAINT



66. Defendant has a history of both ignoring and retaliating against employees who made complaints of harassment and discrimination toward Defendant's agents and employees.

67. As a result of Plaintiff making complaints about: the racist language constantly being used against him; being selectively monitored because of his his race and complaints; being selectively disciplined because of his race and his complaints, being isolated and separated from his white counterparts because of his race; being denied training opportunities because of his race and complaints; and being supervised by a subordinate white person because of his race and complaints, Plaintiff was terminated.

68. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered economic damages in the form of lost wages and benefits in an amount to be determined by a jury at trial.

69. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered non-economic damages in the form of outrage, betrayal, offense, indignity, embarrassment, humiliation, injury and insult in amounts to be determined by the jury at trial.

70. Defendant's conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to Plaintiff's federally protected rights, which warrants an imposition of punitive damages in such amounts as the jury may deem appropriate to deter future violations.

71. Plaintiff seeks recovery of all other equitable relief and damages as provided by law, in addition to reimbursement of her reasonable attorneys' fees and costs pursuant to ORS 659A.885.

**WHEREFORE**, Plaintiff prays for judgment against defendants as follows:

1. Economic damages in the form of lost wages and benefits based on Defendant's unlawful acts in an amount to be determined a trial;



2.  Non-economic damages for the outrage, betrayal, offense, indignity, embarrassment, humiliation, injury and insult Plaintiff suffered in an amount to be determined at trial;

3.  Punitive damages consistent with the claims above against Defendant in amounts to be determined at trial;

4.  Reasonable attorneys' fees and litigation expenses/costs herein, including expert witness fees and expenses, consistent with the claims above against defendants; and

5.  Grant such other relief as is just and proper.

DATED this 29TH day of April, 2021.

HARMON JOHNSON LLC

*/s/ Erious Johnson*
Erious Johnson, Jr., OSB #130574
E-mail: ejohnson.HJLLC@gmail.com

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL**

PAGE 15 – COMPLAINT

HARMON JOHNSON LLC
698 12TH ST SE, STE 240, NO. 4
SALEM, OR 97301
EJOHNSON.HJLLC@GMAIL.COM
(503) 991-8545 (PHONE)
(503) 622-8545 (FAX)